# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                           )
                                                 )
VAIL PLAZA DEVELOPMENT, LLC                      )        Case No. 08-26920 (HRT)
EIN:  75-1981329                                 )        Chapter 11
                                                 )
                        Debtor.                  )
                                                 )
_____          )

---

## SHAW CONSTRUCTION LLC'S ~~THIRD~~FOURTH AMENDED PLAN OF LIQUIDATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**SHERMAN & HOWARD L.L.C.**
Mark L. Fulford
Michael J. Cook
John W. Mill
633 Seventeenth St., Ste. 3000
Denver, Colorado 80202
Telephone:  (303) 299-8454
Facsimile:  (303) 298-0940

Dated:  ~~September 16,~~November 20, 2009

EXHIBIT B

Error! Unknown document property name.
Error! Unknown document property name.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ................................. 1
   A.   Defined Terms ............................................................................................. 1
   B.   Rules of Interpretation ............................................................................... 10
   C.   Exhibits ...................................................................................................... 11
ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS (UNCLASSIFIED CLAIMS) 11
   A.   Administrative Claims ............................................................................... 11
   B.   Priority Tax Claims ................................................................................... 12
   C.   Other Priority Claims ................................................................................ 12
ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND MEMBERSHIP
INTERESTS ...................................................................................................... 12
   A.   Summary ................................................................................................... 12
   B.   Classification and Treatment of Claims and Membership Interests ............ 13
   C.   Non-Consensual Confirmation .................................................................. ~~17~~18
ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................... ~~17~~18
   A.   The Sale Process ....................................................................................... ~~17~~18
   B.   Appointment of a Plan Administrator ........................................................ ~~18~~19
   C.   Rights and Powers of the Plan Administrator ............................................. ~~23~~24
   D.   Directors/Officers/Equity/Assets of the Debtor on the Confirmation Date ................ ~~23~~24
   E.   Cancellation of Membership Interests ....................................................... ~~23~~24
   F.   Renaming of Vail Plaza Development, LLC ............................................... ~~23~~25
   G.   Exclusivity Period .................................................................................... ~~23~~25
   H.   Establishment of the Administrative Bar Date ........................................... ~~24~~25
   I.   Term of Injunctions or Stays ..................................................................... ~~24~~25
ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS ........................................ ~~24~~25
   A.   Initial Distribution Date ............................................................................ ~~24~~25
   B.   Distribution in Order of Priority ............................................................... ~~24~~26
   C.   Disputed Reserves ..................................................................................... ~~24~~26
   D.   Quarterly Distributions ............................................................................. ~~25~~26
   E.   Record Date for Distributions ................................................................... ~~25~~26
   F.   Delivery of Distributions .......................................................................... ~~25~~27
   G.   Surrender of Canceled Instruments and Securities ..................................... ~~26~~28
   H.   Lost, Stolen, Mutilated or Destroyed Instrument or Security ...................... ~~27~~28
   I.   Manner of Cash Payments Under the Plan ................................................. ~~27~~29
   J.   Time Bar to Cash Payments by Check ....................................................... ~~27~~29
   K.   Limitations on Funding of Disputed Reserves ........................................... ~~28~~29
   L.   Compliance with Tax Requirements .......................................................... ~~28~~29
   M.   No Payments of Fractional Dollars ........................................................... ~~28~~29
   N.   Interest on Claims ..................................................................................... ~~28~~30
   O.   No Distribution in Excess of Allowed Amount of Claim ............................ ~~29~~30
ARTICLE VI. DISPUTED CLAIMS ......................................................................... ~~29~~30

i

| | | |
|---|---|---|
| A. | No Distribution Pending Allowance | ~~29~~30 |
| B. | Resolution of Disputed Claims | ~~29~~30 |
| C. | Disallowance of Claims | ~~29~~30 |
| ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | ~~29~~31 |
| A. | Rejection of Executory Contracts and Unexpired Leases | ~~29~~31 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | ~~30~~31 |
| ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | | ~~30~~31 |
| A. | Conditions Precedent to the Effective Date | ~~30~~31 |
| ARTICLE IX. RELEASE, INJUNCTIVE AND RELATED PROVISIONS | | ~~31~~32 |
| A. | Compromise and Settlement | ~~31~~32 |
| B. | Exculpation | ~~31~~32 |
| C. | Preservation of Rights of Action | ~~31~~33 |
| D. | Release and Injunction | ~~33~~34 |
| E. | Releases of Liens | ~~34~~35 |
| ARTICLE X. RETENTION OF JURISDICTION | | ~~34~~36 |
| ARTICLE XI. MISCELLANEOUS PROVISIONS | | ~~35~~37 |
| A. | Final Fee Applications | ~~35~~37 |
| B. | Payment of Statutory Fees | ~~36~~37 |
| C. | Modification of Plan | ~~36~~37 |
| D. | Revocation of Plan | ~~36~~38 |
| E. | Successors and Assigns | ~~36~~38 |
| F. | Governing Law | ~~36~~38 |
| G. | Reservation of Rights | ~~37~~38 |
| H. | Section 1146 Exemption | ~~37~~38 |
| I. | Section 1125(e) Good Faith Compliance | ~~37~~39 |
| J. | Further Assurances | ~~37~~39 |
| K. | Service of Documents | ~~37~~39 |
| L. | Filing of Additional Documents | ~~38~~40 |
| M. | No Stay of Confirmation Order | ~~38~~40 |

~~Error! Unknown document property name.~~Error! Unknown document property name.

## SHAW CONSTRUCTION LLC'S ~~THIRD~~FOURTH AMENDED PLAN OF LIQUIDATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, Shaw Construction LLC ("Shaw"), hereby respectfully proposes the following ~~Third~~Fourth Amended Plan of Liquidation (the "Plan").

### INTRODUCTION

This Plan calls for a prompt sale of the Vail Plaza Hotel ~~either through a four-month auction or more promptly, if a more prompt sale seems desirable.~~for $46,000,000, composed of a $5 million escrow, and additional $15 million in cash at Closing for a total of $20 million at closing (plus the availability of the $5 million Club Estate and Parking Sales Escrows, which are not purchased) and a five-year promissory note secured by a first lien against the Hotel in the amount of $26,000,000. The sale would be handled by an experienced Plan Administrator, who will report to a ~~three~~five-person Plan Administration Committee. Funds will be distributed to Allowed Claims as promptly as possible. If higher bids are proposed they can be considered. If for some reason the proposed purchase is unsuccessful, the Plan Administrator will manage the Hotel and arrange for additional marketing and sell it.

### ARTICLE I.
### DEFINED TERMS AND RULES OF INTERPRETATION

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation: (a) success fees allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction and (b) fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code, or otherwise rendered prior to the Effective Date, or rendered after the Effective Date in connection with (x) applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code or (y) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Case that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a

Error! Unknown document property name.
Error! Unknown document property name.

Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

2.    "*Administrative Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Expense in the manner indicated in Article II of the Plan.

3.    "*Administrative Claims*" means Claims that have been timely filed before the Administrative Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) Accrued Professional Compensation; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930; *provided, however*, that Administrative Claims that arise under section 503(b)(9) of the Bankruptcy Code shall only be deemed timely filed to the extent such Claims were filed in accordance with the terms of the Bar Date Order.

4.    "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means, with respect to any Claim or Membership Interest, except as otherwise provided herein:  (a) a Claim or Membership Interest that has been scheduled by the Debtor in its schedules of liabilities as other than disputed, contingent or unliquidated and as to which the Debtor or other parties-in-interest have not Filed an objection by the Claims Objection Bar Date; (b) a Claim or Membership Interest that either is not Disputed or has been allowed by a Final Order; (c) a Claim or Membership Interest that is allowed:  (i) in any stipulation of amount and nature of Claim or Membership Interest executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Plan Administrator of amount and nature of Claim or Membership Interest executed on or after the Confirmation Date; or (iii) in or pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim or Membership Interest that is allowed pursuant to the terms hereof;  (e) a Disputed Claim as to which a proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Bar Date; or a Disputed Mechanic's Lien Claim as to which a final ruling has been handed down from an arbitration  between Shaw and the Debtor.

6.    "*Arbitration*" means the arbitration process commenced pursuant to the Bankruptcy Court's May 7, 2009 Order Appointing Arbitrator (Docket No. 317).

7.    "*Assets*" means all real and personal property of the Debtor and its Estate of any kind or nature as of the Effective Date, and includes, without limitation, all of the Debtor's property, personal, tangible and intangible, including, without limitation, the Resort Cash,

2

accounts receivable, goods, equipment, furniture, inventory, chattel paper, documents, instruments, money, fixtures, contract rights, general intangibles, insurance proceeds, tax refunds, Causes of Action, internet websites, intellectual property, trademarks, trade names, copyrights, patents, claims and rights of any kind, wherever situated, together with the proceeds thereof, including but not limited to the unsold Club Estate (or fractional) Interests, parking spaces both in the Hotel and in the Vail Village Inn Plaza Condominium development, and the Penthouse.

8.      "*Auction*" means the auction of the Resort as contemplated in the Bidding Procedures or pursuant to the Expedited Sale described in Article IV A 4..

9.      "*Available Funds*" has the meaning set forth in Article IV.B.3.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

11.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended from time to time, and applicable portions of titles 18 and 28 of the United States Code.

12.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Colorado.

13.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Colorado, the Local Rules of Civil Practice and Procedure of the United States District Bankruptcy Court for the District of Colorado, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

14.      "*Bar Date Order*" means the Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof, entered by the Bankruptcy Court.

15.      "*Bidding Procedures*" means the procedures pursuant to which the Resort Sale will be conducted as set forth on Schedule 1 hereto or in the Expedited Sale provision in Article IV A 4..

16.      "*Broker*" means the broker or brokers or investment banker selected by the Plan Administrator to sell the Resort.

Error! Unknown document property name.
Error! Unknown document property name.

17. *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Federal Rule of Bankruptcy Procedure 9006(a)).

18. *"Capmark Bank Assignment of Rents"* means that certain Assignment of Leases and Rents dated as of August 29, 2006 by the Debtor in favor of Capmark Bank.

19. *"Capmark Bank Deed of Trust"* means that certain Deed of Trust, Assignment of Leases and Profits, Security Agreement and Fixture Filing dated as of August 29, 2005 by the Debtor in favor of the Public Trustee of the County of Eagle, as Trustee for the benefit of Capmark Bank, as beneficiary, which secures the Capmark Bank Note.

20. *"Capmark Bank Loan Agreement"* means that certain Building Loan Agreement dated August 29, 2005, pursuant to which the Debtor borrowed $68,000,000 from Capmark Bank to finance the construction and development of the Resort.

21. *"Capmark Bank Loan Documents"* means the Capmark Loan Agreement, the Capmark Bank Note, the Capmark Bank Deed of Trust, the Capmark Bank Assignment of Rents and all other related documents.

22. *"Capmark Bank Note"* means that certain Deed of Trust Note dated August 29, 2005 by the Debtor in favor of Capmark Bank in the original principal amount of $68,000,000 (the "Note").

23. *"Cash"* means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and readily marketable securities or instruments issued by an Entity, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

24. *"Cash Investment Yield"* means the net yield earned by the Plan Administrator from the investment of Cash held pending Distribution in accordance with the provisions of the Plan.

25. *"Causes of Action"* means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code, including Avoidance Actions) of any of the

4

Error! Unknown document property name.
Error! Unknown document property name.

Debtor, the Debtor-in-Possession, and/or the Estate (including, without limitation, those actions set forth in the Plan Supplement) that are or may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date against any entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Confirmation Date.

26.    "*Chapter 11 Case*" means the chapter 11 case commenced when the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date, which is jointly administered with the bankruptcy case of Vail Plaza Mezzanine, LLC, Case Number 08-26924 (HRT).

27.    "*Claim*" means a "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

28.    "*Claims Objection Bar Date*" means the bar date for objecting to proofs of claim.

29.    "*Class*" means a category of holders of Claims or Membership Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

30.    "*Closing Date*" means the date on which the Resort Sale will be finalized.

31.    "*Confirmation Date*" means the date and the exact time when the Confirmation Order is entered by the Bankruptcy Court.

32.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.    "*Creditor*" means the holder of a Claim against the Debtor as defined in section 101(10) of the Bankruptcy Code.

34.    "*Debtor*" or "*Debtor-in-Possession*" means Vail Plaza Development, LLC.

35.    "*Disclosure Statement*" means *Shaw's Disclosure Statement for the Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated ~~July 6,~~November 11, 2009 prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court in the Disclosure Statement Order, as it is amended, supplemented or modified from time to time.

36.    "*Disclosure Statement Order*" means the Bankruptcy Court's order approving the Disclosure Statement, entered by the Bankruptcy Court on ~~September ——,~~November 5, 2009.

37.    "*Disputed*" means, with respect to any Claim or Membership Interest, any Claim or Membership Interest: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been timely Filed; or (b) as to which a party in interest or the Plan

Error! Unknown document property name.
Error! Unknown document property name.

Administrator has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules.

38.     *"Disputed Reserve"* means the reserve fund created pursuant to Article V.C.1 of the Plan.

39.     *"Distributions"* means the distributions of Cash to be made in accordance with the Plan.

40.     *"Distribution Accounts"* means bank accounts established by the Plan Administrator for the purposes set forth herein and shall include separate escrow accounts for proceeds from the sale of Club Estate Fractional Interests and Parking Spaces.

41.     *"Effective Date"* means the date selected by the Plan Administrator that is a Business Day after the entry of the Confirmation Order on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.A have been satisfied or waived.

42.     *"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

43.     *"Estate"* means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

44.     *"Excluded Assets"* means Cash, Accounts Receivable, Proceeds of Pre-confirmation Assets Unit Sales, Village Inn Parking Space Sales Proceeds, Tax Refund Reserve, and other escrows set up by Court Order, and Causes of Action.

45.     *"File"* or *"Filed"* means, with respect to any pleading, entered on the docket of the Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

46.     *"Final Arbitration Decisions"* means all final decisions in the Arbitration and includes all final decisions by ARC Integrated Program Management Inc. ("ARC") pursuant to the June 26, 2007 Change Order between Shaw and Debtor where Shaw requested a meeting and a meeting was held prior to the issuance of a final decision by ARC, but not including any other final decisions by ARC and not including any preliminary decisions by ARC.   In addition, any other disputed items subject to arbitration expressly agreed upon in writing as final by Shaw, the Debtor and the subcontractor(s) (if any) with an economic interest in the particular claim, shall be Final Arbitration Decisions.

47.     *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest Bankruptcy Court to which the order or judgment

6

was appealed or from which certiorari was sought or has otherwise been dismissed with prejudice.

48. "*Fractional Interest Owners' Claims*" means the claims of purchasers of fractional interests, sometimes called Club Estate, in the Resort.

49. "*General Bar Date*" means July 31, 2009, as established in the Bar Date Order.

50. "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, the Secured Capmark Bank Claim, Secured Mechanic's Lien Claims, Claims of Insiders, Subordinated Claims, or Membership Interests.

51. "*Impaired*" means, with respect to a Claim, Membership Interest, or Class of Claims or Membership Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

52. "*Initial Distribution Date*" means the date on which the Plan Administrator shall make its initial Distribution, which shall be a date selected by the Plan Administrator occurring as promptly as possible after the Closing Date of the Resort Sale and after all Disputed Secured Mechanic's Lien Claims have been resolved.

53. "*Insider*" means an "insider" as defined in section 101(31) of the Bankruptcy Code.

54. "~~*Mechanic's Lien Claimant*~~" ~~means a holder of a Claim secured by a lien created and perfected under the Colorado General Mechanics' Lien Act, Colo. Rev. Stat. § 38-22-101 *et seq.*~~*Junior Secured Mechanic's Lien Claim*" means a Claim for payment for goods or services provided to or upon the Project that is secured by a mechanic's lien upon the Project that, if Allowed, would be junior in priority to Capmark Bank's Deed of Trust under C.R.S. § 38-22-106(1).

55. "*Membership Interest*" means any ownership interest in the Debtor that existed immediately prior to the Petition Date, including, without limitation, any membership or equity interest in the Debtor together with any option or legal contractual or equitable rights to purchase or acquire such interests that existed immediately prior to the Petition Date.

56. "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code other than Priority Tax Claims.

57. "*Petition Date*" means October 27, 2008, the date on which the Debtor Filed the Chapter 11 Case.

58. "*Plan*" means this plan of liquidation under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time

7

to time in accordance with the Bankruptcy Code and the Bankruptcy, and the Plan Supplement, which is incorporated herein by reference.

59.   "*Plan Administration Committee*" means those ~~three~~five individuals, or their successors, appointed in accordance with the Plan consisting initially of one representative appointed by Shaw, one representative appointed by vote of the General Unsecured Creditors (Class ~~5) and~~6), one representative appointed by the Fractional Interest Owners (Class 6<u>7</u>), ~~and~~ one representative appointed by a majority in number of the Mechanic's Lien Claimants other than Shaw, and one representative appointed by Capmark Bank.

60.   "*Plan Administration Expenses*" means the reasonable fees and expenses of the Plan Administrator and the Plan Administration Committee, including, without limitation, reasonable professional fees.

61.   "*Plan Administrator*" means William Sullivan.

62.   "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan, as it may be altered, amended or supplemented from time to time.

63.   "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

64.   "*Pro Rata*" means the ratio of the amount of an Allowed Claim in a particular Class to the aggregate amount of all Allowed Claims in such Class.

65.   "*Proceeds of Pre-Confirmation Asset Unit Sales*" means the proceeds of the sales of fractional interests consummated by the Debtor prior to the Effective Date of the Plan (excluding any Resort Sale Proceeds).

66.   "*Professional*" means any person or Entity employed pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

67.   "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30 and December 31 of each calendar year).

68.   "*Ratable Proportion*" means, with reference to: (a) a Distribution on account of any Allowed Claim in any Class, the ratio (expressed as a percentage) that the amount of the Allowed Claim bears to the aggregate amount of all Allowed and Disputed Claims in that Class, or (b) a Distribution to two or more Classes, the ratio (expressed as a percentage) that the aggregate amount of the Allowed Claims in a Class bears to the aggregate amount of all Allowed Claims in the affected Classes.

Error! Unknown document property name.
Error! Unknown document property name.

69. *"Record Date"* means the record date for determining the entitlement of holders of Claims, to receive Distributions under the Plan on account of Allowed Claims. The Record Date shall be the date on which the Disclosure Statement Order is entered.

70. *"Representatives"* means, with regard to an Entity, officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals).

71. *"Resort"* means the mixed use facility located at 16 Vail Road, in Vail, Colorado, described by the Debtor as consisting of (a) a 100-room boutique hotel that includes banquet space, 8518 square feet of retail space, two restaurants, a spa and health club, outdoor swimming pool and other amenities customarily associated with a luxury boutique hotel; (b) a 38-unit residential club sold as two-week interval fractional interests for use during the peak winter and summer months that revert to hotel rooms during the off-season and all unsold fractional interests; (c) an approximately 5,309-square foot luxury condominium; and (d) a 210-space underground parking garage to be used by the hotel guests and fractional interest owners, and also including the unsold Village Inn Parking Spaces, and all equipment, furniture and fixtures attached to or relating to the foregoing, including but not limited to all contents of the hotel retail spaces, conference spaces, kitchens, offices, guest rooms, restaurants, reception areas, lobby and public areas.

72. *"Resort Sale"* means the sale of the Resort as provided for herein in accordance with the Bidding Procedures or in Article IV A 4.

73. *"Resort Sale Proceeds"* means all of the consideration received by the Estate for the sale of the Resort, profits of the Plan Administrator in managing the Resort, and Cash and other Assets received by the Plan Administrator pursuant to this Plan, to the extent not expended in the Plan Administrator's operations.

74. *"Resort Sale Order"* means an order of the Bankruptcy Court entered in the Chapter 11 Case approving the Resort Sale.

75. *"Schedules"* mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code.

76. *"Secured Capmark Bank Claim"* means the Claim of Capmark Bank, as Agent, on account of Claims arising under the Capmark Bank Loan Documents.

77. *"Secured Claim of Vail Plaza Condominium Association, Inc."* means the Allowed Claim held by Vail Plaza Condominium Association, Inc., in an amount and to the extent secured under the Colorado Condominium Ownership Act, Colo. Rev. Stat. § 38-33-101 *et seq.* or the Colorado Common Interest Ownership Act, Colo. Rev. Stat. § 38-33.3-101 *et seq.*

Error! Unknown document property name.
Error! Unknown document property name.

78. *"Secured Mechanic's Lien Claims"* means the Allowed Claims held by the Mechanic's Lien Claimants, in an amount and to the extent secured under the Colorado General Mechanics' Lien Act, Colo. Rev. Stat. § 38-22-101 *et seq.,* including but not limited to attorneys fees for both pre-petition and post-petition efforts to enforce liens and recover amounts due, and interest at the contract rate of 18% per annum through the Closing Date of the Resort Sale and the payment of the Secured Mechanic's Lien Claims in full.

79. *"Senior Mechanic's Lien Claimant"* means a holder of a Claim secured by a lien created and perfected under the Colorado General Mechanics' Lien Act, Colo. Rev. Stat. § 38-22-101 *et seq.* that is senior to the secured claim of Capmark Bank.

80. ~~79.~~ *"Subordination Litigation"* means *4-H Family LLC, et al. v. Vail Plaza Development, LLC, et al.,* Adversary # 09-01247-HRT or litigation brought by the Plan Administrator to subordinate claims of Daymer Corporation, Waldir Prado, or other Insiders, or any combination of such litigation.

81. ~~80.~~ *"Tax Refund Reserve"* means funds derived from tax refunds due or paid to Debtor or held by Debtor's agents.

82. ~~81.~~ *"Unsecured Claim of Vail Plaza Condominium Association, Inc."* means that portion of the Claim held by Vail Plaza Condominium Association, Inc. that is not a Secured Claim of Vail Plaza Condominium Association, Inc.

83. ~~82.~~ *"Unsecured Mechanic's Lien Claims"* means those portions of the Claims of Mechanic's Lien Claimants that are not Secured Mechanic's Lien Claims.

84. ~~83.~~ *"U.S. Trustee"* means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Colorado.

85. ~~84.~~ *"VPHM"* means Vail Plaza Hotel Management, LLC.

86. ~~85.~~ *"Village Inn Parking Space Sales Proceeds"* means proceeds from the sale of underground parking spaces in the Vail Village Inn Plaza Condominium development in Vail, Colorado, represented by Debtor to be numbered spaces 766-794 and 797-805.

B.   *Rules of Interpretation*

1. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or

10

supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

        2.      The provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

        3.      All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

C.     *Exhibits*

        The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court not later than the earlier of (i) ten (10) days prior to the commencement of the hearing on confirmation of the Plan and (ii) five (5) days prior to the deadline for filing objections to confirmation of the Plan. The various agreements, exhibits, and other documents comprising the Plan Supplement may be filed in one or more filings with the Bankruptcy Court, provided that each such agreement, exhibit, and other document shall state that it is part of the Plan Supplement. Such agreements, exhibits and other documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Holders of Claims or Membership Interests may also obtain a copy of such exhibits, once filed, from Shaw by a written request sent to the following address:

                    Sherman & Howard L.L.C.
                    633 Seventeenth St., Ste. 3000
                    Denver, Colorado 80202
                    Attn: Mark L. Fulford, Esq.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS
## (UNCLASSIFIED CLAIMS)

A.     *Administrative Claims*

        1.      <u>Allowed Administrative Expenses</u>

        Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Plan Administrator shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as

11

soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided, however*, that Administrative Claims do not include Administrative Claims Filed after the Administrative Bar Date or Administrative Claims Filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date. Claims of Debtor's professionals shall be paid first from the Tax Refund Reserve.

  2. <u>Professional Compensation and Reimbursement Claims</u>

   The Bankruptcy Court shall fix in the Confirmation Order a date for filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.

B. *Priority Tax Claims*

   The Plan Administrator shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

C. *Other Priority Claims*

   On or as soon as practicable after the Effective Date, the Plan Administrator shall pay each holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim the full unpaid amount of such Allowed Other Priority Claim in Cash.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLAIMS AND MEMBERSHIP INTERESTS**

A. *Summary*

   1. This Plan constitutes a chapter 11 plan of liquidation for the Debtor. In accordance with section 1123(a)(1) of the Bankruptcy Code, Shaw has not classified Administrative Claims, Priority Tax Claims and Other Priority Claims, as described in Article II.

   2. The following table classifies Claims and Membership Interests for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Membership Interest to be classified in a particular Class only to the extent that the Claim or Membership Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the

12

extent that any remainder of such Claim or Membership Interest qualifies within the description of such different Class.  A Claim or Membership Interest is in a particular Class only to the extent that any such Claim or Membership Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

   3.   *Summary of Classification and Treatment of Classified Claims and Membership Interests.*

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Allowed Property Tax Claim | Impaired | Entitled to Vote |
| 2 | Senior Secured Mechanic's Lien Claims | Impaired | Entitled to Vote |
| 3 | Secured Capmark Bank Claim | Impaired | Entitled to Vote |
| 4 | Junior Secured Mechanic's Lien Claim | Impaired | Entitled to Vote |
| 4~~5~~ | Secured Claim of Vail Plaza Condominium Association, Inc. | Impaired | Entitled to Vote |
| ~~5~~6 | General Unsecured Claims | Impaired | Entitled to Vote |
| ~~6~~7 | Fractional Interest Owners' Claims | Impaired | Entitled to Vote |
| ~~7~~8 | Subordinated Claims | Impaired | Entitled to Vote |
| ~~8~~9 | Membership Interest of Vail Plaza Mezzanine, LLC | Impaired | Entitled to Vote |

B.   *Classification and Treatment of Claims and Membership Interests*

   1.   *Allowed Property Tax Claim (Class 1)*

      (a)   *Classification:*   Class 1 consists of the Secured Property Tax Claim of Eagle County.

      (b)   *Treatment:*   On the Initial Distribution Date, the Plan Administrator shall pay Cash from the Tax Refund Reserve remaining after payment of Professional Fees from the Tax Refund Reserve and then, to the extent necessary, from the Resort Sale Proceeds, but not from the proceeds of Pre-confirmation Asset Unit Sales or the Village Inn Parking Space Sales, to the holder of the Allowed Property Tax Claim in an amount necessary to satisfy each Allowed Property Tax Claim in full.  To the extent a Class 1 Claim is disputed at the Initial Distribution Date, an amount sufficient to pay such disputed Class 1 Claim in full shall be deposited in the Disputed Reserve.

      (c)   *Voting:*   Class 1 is impaired and holders of Allowed Property Tax Claims are entitled to vote to accept or reject the Plan.  Only holders of Allowed Secured Tax Claim shall receive a distribution in this class under the terms of the Plan.

   2.   *Senior Secured Mechanic's Lien Claims (Class 2)*

13

      (a)    *Classification*: Class 2 consists of the Senior Secured Mechanic's Lien Claims.

      (b)    *Treatment*: On the Initial Distribution Date, the Plan Administrator shall pay Cash from the proceeds of Pre-Confirmation Asset Unit Sales, the Resort Sale Proceeds, and all other Assets, except not from the Village Inn Parking Space Sales, to each holder of an Allowed Secured Mechanic's Lien Claim in an amount necessary to satisfy each Allowed Secured Mechanic's Lien Claim in full, with interest at the contractual rate (18% pursuant to the Shaw-VPD contract) or 12% per annum pursuant to C.R.S. § 38-22-101(5), whichever is applicable, and costs and all other fees and charges permitted under applicable law, through the date of payment in full. To the extent a Class 2 claim is Disputed at the Initial Distribution Date, an amount sufficient to pay such disputed Class 2 claim in full, including an amount sufficient to pay applicable accrued interest on all such claims, shall be deposited in a Disputed Reserve.

      (c)    *Voting*: Class 2 is Impaired, and holders of Senior Secured Mechanic's Lien Claims are entitled to vote to accept or reject the Plan. Only holders of Allowed Senior Secured Mechanic's Lien Claims shall receive a Distribution in this class under the terms of the Plan.

3.    *Secured Capmark Bank Claim (Class 3)*

      (a)    *Classification*: Class 3 consists of the Secured Capmark Bank Claim.

      (b)    *Treatment*: On the Initial Distribution Date, the Plan Administrator shall pay to Capmark Bank all of the Village Inn Parking Space Sales Proceeds. On the Initial Distribution Date, and after the Secured Mechanic's Lien Claims have been paid in full, or a sufficient Disputed Reserve has been funded, the Plan Administrator shall pay to Capmark Bank from the Proceeds of the Pre-Confirmation Asset Unit Sales, the Resort Sale Proceeds, and all other Assets the amount necessary to pay the Allowed Capmark Bank Secured Claim in full.

      (c)    *Voting*: Class 3 is Impaired, and Capmark Bank is entitled to vote to accept or reject the Plan.

4.    *Junior SecuredMechanic's Lien Claims (Class 4)*

      (a)    *Classification*: Class 4 consists of the Junior Secured Mechanic's Lien Claims. For purposes of Distributions and Disputed Reserves, each Class 4 Claim shall constitute a separate subclass comprising only one Creditor, and Distributions and Disputed Reserves shall be made or established consistent with the priorities of the mechanic's liens held by the respective Class 4 Creditors. If the Class 4 Creditors and the Plan Administrator cannot agree upon the priorities of liens within Class 4, then the Bankruptcy Court will decide such priorities in an appropriate proceeding.

14

(b)        *Treatment*:

(i)        *Undisputed Claims.*  If any Class 4 Claim is Undisputed on the Initial Distribution Date, then the Plan Administrator shall pay Cash from the Sale Proceeds to the extent available to the holder of each such Undisputed Claim in an amount necessary to satisfy such Claim in full; provided, however, that no Class 4 Claim shall be paid unless all Class 4 Claims with an asserted equal or higher lien priority shall have been paid in full or the required Disputed Reserve has been established for such Claims.

(ii)        *Disputed Claims.*  If any Class 4 Claim is Disputed on the Initial Distribution Date, then as to each such Disputed Claim:  (1) the Plan Administrator shall pay to the holder of such claim only the Undisputed Portion of such Claim, if any; (2) the Plan Administrator shall deposit Cash from the Sale Proceeds, when it becomes available, into the Disputed Reserve in an amount sufficient to pay the Disputed Portion of such Claim in full; (3) after Final Determination of the full allowed amount of such Claim in accordance with this Plan, the Plan Administrator shall pay to the holder of such Claim the unpaid allowed amount of such Claim, if any, from the Disputed Reserve as may be necessary to satisfy such Allowed Claim in full; and (4) the Plan Administrator shall then deposit the unused remainder of the Disputed Reserve in relation to such Claim, if any, into the Unsecured Claims Fund.  No Class 4 Claim shall be paid unless all Class 4 Claims with an asserted equal or higher lien priority have been paid in full or the required Disputed Reserve has been established for such Claims.

(iii)        *Lien and Priority.*  Upon the Closing Date:  (1) the lien of each Class 4 Claim shall attach to the Sale Proceeds in the same amount, validity and priority as the lien of such Claim upon the Assets of the Debtor; and (2) the lien of each Class 4 Claim upon any interest at the Project, including all interests of the Debtor and all Club Estates and Common Elements owned in whole or in part by non-Debtors, shall be fully discharged and released.  The liens of the Class 4 Claims upon the Sale Proceeds shall have priority over the lien of any claim or interest in Classes 5 through 9.  The Plan Administrator shall pay each Class 4 Claim in full if it is Undisputed, or shall pay the Undisputed Portion of each Disputed Class 4 Claim and establish a Disputed Reserve for the Disputed Portion of each such Claim, prior to any payment of or establishment of a Disputed Reserve for any Claim or interest in Classes 5 through 9.  Upon payment in full of any Class 4 Claim, the lien of that Claim upon the Sale Proceeds shall be fully discharged and released.

(c)        *Voting*:  Class 3 is Impaired, and Capmark Bank is entitled to vote to accept or reject the Plan.

5.        4. *Secured Claim of Vail Plaza Condominium Association, Inc. (Class 4*5*)*

(a)        *Classification*:  Class 4*5* consists of the Secured Claim of Vail Plaza Condominium Association, Inc.

Error! Unknown document property name.
Error! Unknown document property name.

(b)   *Treatment*:  On the Initial Distribution Date, and only after the Secured Mechanic's Lien Claims and Secured Capmark Claim are paid in full, or a sufficient Disputed Reserve has been funded, the Plan Administrator shall pay Cash from the Proceeds of Pre-Confirmation Asset Unit Sales, the Village Inn Parking Space Sales Proceeds, and the Resort Sale Proceeds, to the holder of the Allowed Secured Claim of Vail Plaza Condominium Association, Inc. in an amount necessary to satisfy the Allowed Claim in full, with interest at the rate permitted under applicable law through the Confirmation Date, to the extent funds are available to make such payment.

(c)   *Voting*:  Class 4~~5~~ is Impaired, and the holder of the Secured Claim of Vail Plaza Condominium Association, Inc. is entitled to vote to accept or reject the Plan.  The holder of the Allowed Secured Claim of Vail Plaza Condominium Association, Inc. shall receive a Distribution under the terms of the Plan in the order of priority.

<u>6.</u>               ~~5.~~ *General Unsecured Claims (Class 5~~6~~)*

(a)   *Classification*:  Class 5~~6~~ consists of General Unsecured Claims but not Fractional Interest Owners' Claims and not Subordinated Claims.

(b)   *Treatment*:  On or as soon as practicable after the Initial Distribution Date, and only after payment in full of the Allowed Property Tax Claim, Secured Mechanic's Lien Claims, the Secured Capmark Claim, and the Secured Claim of Vail Plaza Condominium Association, Inc., or a sufficient Disputed Reserve has been funded, the Plan Administrator shall pay each holder of an Allowed General Unsecured Claim, in partial satisfaction of such Allowed General Unsecured Claim, its Ratable Proportion of the Cash remaining after payment in full of Allowed Claims in Classes 1, 2, 3~~3, 4~~ and 4~~5~~.  On each Quarterly Distribution Date after the Initial Distribution Date, the Plan Administrator may, in his sole and absolute discretion, make additional Distributions to holders of Allowed General Unsecured Claims of each holder's Ratable Portion of the Cash (or any portion thereof) held in the Distribution Fund on that date.  For purposes of clarity, any unsecured portion of the Mechanic's Lien Claims and any unsecured portion of the Claim of Vail Plaza Condominium Association, Inc. are Class 5~~6~~ General Unsecured Claims.  General Unsecured Claims include interest at the contract rate applicable to such claim or, if there is no such contract rate, at the annual rate of eight percent.  Such interest shall only be paid in the event that there are funds available to pay the principal amount of General Unsecured Claims in full.

(c)   *Voting*:  Class 5~~6~~ is Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.  Only holders of Allowed General Unsecured Claims shall receive a Distribution under the Plan.  If the Plan Administrator decides to pursue an action to subordinate all or a portion of the claims in Class 7~~,8,~~ the Plan Administrator shall establish a Disputed Reserve for payment of Class 5~~6~~ so that if none or less than all of the claims in Class 7~~8~~ are not subordinated, there will be funds available to pay the Class 7~~8~~ claims that are not subordinated, on the same basis as Class 5~~6~~ Allowed Claims.

16

<u>7.</u>          6.-*Fractional Interest Owners' Claims (Class 6̶7̲)*

(a)     *Classification*:   Class 6̶7̲ consists of the claims of Fractional Interest Owners.

(b)     *Treatment*:  Fractional Interest Owners' Claims are disputed.  They shall be resolved through the Claims allowance process.  A Disputed Reserve shall be established for them, pending resolution of their claims.  Once the Claims allowance process is completed, the allowed Class 6̶7̲ Fractional Interest Owners' Claims shall be treated equally with Class 5̶6̲ General Unsecured Claims.

(c)     *Voting*:  Class 6̶7̲ is Impaired, and the holders of Allowed Fractional Interest Owners' Claims are entitled to vote to accept or reject the Plan.  Only holders of Allowed Fractional Interest Owners' Claims shall receive a Distribution under the Plan.

<u>8.</u>          7.-*Subordinated Claims (Class 7̶8̲)*

(a)     *Classification*:   Class 7̶8̲ consists of Subordinated Claims, which will include any Allowed Claim of Daymer Corporation or Waldir Prado, any Allowed Claim that may result from the rejection of the management contract between the Debtor and VPHM, any other claims of VPHM, and any other Claims of Insiders.

(b)     *Treatment*:  As soon as practicable after the Effective Date, the Plan Administrator shall determine whether treatment of Class 7̶8̲ as a subordinated class will make any difference in the distribution to be received by Class 5̶6̲ or 6̶7̲ or any other class.  If the Plan Administrator determines that subordination of Class 7̶8̲ would make a difference in the distribution that Class 5̶6̲ or 6̶7̲ or any other class would receive, the Plan Administrator shall bring a complaint for subordination of Class 7̶8̲ in the Bankruptcy Court or join pending Subordination Litigation.  If the Plan Administrator determines that subordination of Class 7̶8̲ may make a difference, the Plan Administrator shall set aside a Disputed Reserve sufficient to provide to Class 7̶8̲ its full distribution as if it had not been subordinated, and this Disputed Reserve shall be held until conclusion of the Subordination Litigation.  If all or part of the claims in Class 7̶8̲ are subordinated, the Subordinated Claims shall be paid funds available only after payment in full of the Secured Mechanic's Lien Claims, the Secured Capmark Claim, <u>the Junior Mechanic's Lien Claims,</u> the Secured Claim of Vail Plaza Condominium Association, Inc., and the General Unsecured Claims, in full or partial satisfaction, as the case may be, of such Allowed Subordinated Claim, its Ratable Proportion of the Cash remaining after payment in full of Allowed Claims in Classes 1, 2, 3, 4, 5̶5̲,̲ 6̲ and 6̶7̲,̲ or funding for Disputed Reserves for these Classes.  On each Quarterly Distribution Date after the Initial Distribution Date, the Plan Administrator may, in his sole and absolute discretion, make additional Distributions to holders of Subordinated Claims of each holder's Ratable Portion of the Cash (or any portion thereof) held in the Distribution Fund on that date until all Allowed Subordinated Claims are paid in full, but after payment in full of Allowed Claims in Classes 1, 2, 3, 4, 5̶5̲,̲ 6̲ and 6̶7̲ or funding for Disputed Reserves for

17

Error! Unknown document property name.
Error! Unknown document property name.

those classes.  If none of the claims in Class 7̶8 are subordinated, Class 7̶8 shall have the same treatment as Class 5̶.6̶.  The Plan Administrator shall hold in reserve sufficient funds to prosecute the Subordination Litigation until that litigation is resolved, by judgment or settlement.

(c)   *Voting*:  Class 7̶8 is Impaired, and the holders of Allowed Subordinated Claims are entitled to vote to accept or reject the Plan.

9̶.      8̶. *Membership Interests (Class8̶ 9̶)*

(a)   *Classification*:  Class 8̶9̶ consists of Membership Interests in the Debtor.

(b)   *Treatment*:  On or as soon as practicable after the Initial Distribution Date, and only after payment in full of the Secured Mechanic's Lien Claims, the Secured Capmark Claim, the Junior Mechanic's Lien Claims, the Secured Claim of Vail Plaza Condominiums Association, the General Unsecured Claims, and the Subordinated Claims, the Plan Administrator shall pay each holder of a Membership Interest, in partial satisfaction of such Membership Interest, its Ratable Proportion of the Cash remaining after payment in full of Allowed Claims in Classes 1, 2, 3, 4, 5, 6̶6̶, 7 and 7̶.8̶.  On each Quarterly Distribution Date after the Initial Distribution Date, the Plan Administrator may, in his sole and absolute discretion, make additional Distributions to holders of Membership Interests of each holder's Ratable Portion of the Cash (or any portion thereof) held in the Distribution Fund on that date.

(c)   *Voting*:  Class 8̶9̶ is Impaired, and the holders of Allowed Subordinated Claims are entitled to vote to accept or reject the Plan.

C.   *Non-Consensual Confirmation*

To the extent that any class votes to reject the Plan, Shaw seeks confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan, Shaw further reserves the right to modify the Plan in accordance with Article XI.C.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *The Sale Process*

1.   Retention̶Sale of the Broker̶Hotel

The C̶o̶n̶f̶i̶r̶m̶a̶t̶i̶o̶n̶ ̶O̶r̶d̶e̶r̶ ̶s̶h̶a̶l̶l̶ ̶p̶r̶o̶v̶i̶d̶e̶ ̶t̶h̶a̶t̶ ̶t̶h̶e̶ ̶P̶l̶a̶n̶ ̶A̶d̶m̶i̶n̶i̶s̶t̶r̶a̶t̶o̶r̶ ̶m̶a̶y̶ ̶i̶m̶m̶e̶d̶i̶a̶t̶e̶l̶y̶ ̶r̶e̶t̶a̶i̶n̶ ̶t̶h̶e̶Plan Administrator shall, immediately after appointment, implement the sale pursuant to the Asset Purchase Agreement attached as Exhibit A, or such other sale as is found by the Bankruptcy Court to offer a higher and better price.  The Plan Administrator shall take all steps

18

necessary to implement and close the Asset Purchase Agreement, or such other offer found by the Bankruptcy Court to be higher and better.

If the Asset Purchase Agreement is not approved and no other sale is approved by the Bankruptcy Court, the Plan Administrator shall immediately retain a Broker~~ under terms disclosed in the Plan Supplement~~.  Services to be provided by the Broker will include (i) identifying, contacting and eliciting interest from prospective purchasers; (ii) preparing informational materials describing, among other things, the Resort and the Debtor's operations, management, financial condition and other information; and (iii) assisting in negotiations with any prospective purchaser.

2.            ~~Marketing of the Resort~~  The Broker will commence marketing the Resort for sale as soon as reasonably possible after the Confirmation Date.

3.            ~~Bidding Procedures~~  The Resort will be offered for sale at Auction within four months of the Confirmation Date of the Plan in accordance with the Bidding Procedures attached hereto as ~~Schedule 1.~~Exhibit B.  The minimum price shall be the equivalent of the consideration in Exhibit A.  If the Plan Administrator and the Committee determine that the consideration offered in Exhibit A cannot be obtained, they shall apply to the Court for direction.

4.            ~~Expedited Sale~~

~~In addition to the four month sales process set forth in this Plan and in Schedule 1, Shaw reserves the right to present to the Court a purchase offer.  The offer would be a "stalking horse" minimum bid for a purchase of the Resort (but not the Excluded Assets or a private sale of the Resort (but not the Excluded Assets) for a minimum of $47 million, and would be presented to the Court at the Plan Confirmation Hearing or at such other time as Shaw requests and the Court orders~~If at any point the Plan Administrator, after consultation with the Plan Committee, concludes that there has been sufficient marketing of the Hotel and a satisfactory offer has been received, the Plan Administrator shall seek Bankruptcy Court approval for sale of the Assets to that purchaser without further marketing and without a Public Auction.  The sale would only be approved by the Court if it is satisfied that the marketing and sale process would result in the highest and best offer for the Hotel under the circumstances.

B.      *Appointment of a Plan Administrator*

1.      Post Confirmation Date Operations and Management

The Confirmation Order shall approve the immediate appointment of the Plan Administrator under terms disclosed in the Plan Supplement.  From and after the Confirmation Date through the Effective Date, the Debtor, the Resort, all Assets, and all of the bankruptcy estate shall be operated, managed and governed by the Plan Administrator, who shall have the authority to act as the agent and representative of the Debtor and shall be deemed its sole director, secretary and chief executive and financial officer to the extent required by applicable law or for purposes of executing agreements, instruments and other documents on behalf of the

19

Debtor.  The Plan Administrator shall be empowered to effect all actions necessary to perform and enforce the duties, obligations and rights of the Debtor under the Bankruptcy Code, the Confirmation Order, other Bankruptcy Court orders and applicable law, including, without limitation, retaining management for the Resort and conducting the Resort Sale.  If the original Plan Administrator or any successor Plan Administrator resigns or is terminated, a successor Plan Administrator shall be selected by Shaw, subject to the approval of the Bankruptcy Court.

The Confirmation Order shall require the Debtor and all of its and of VPHM's employees, agents, representatives, successors and affiliates to provide complete cooperation to the Plan Administrator to effectuate an orderly transition of management to the Plan Administrator and such agents, employees and professionals as he may employ.  This includes immediately turning over to the Plan Administrator all Resort files and data in meaningful organization, computer access and passwords, keys and access codes, contact information for employees and key service organizations and vendors, and all other items and data that would be useful or necessary for operation of the Resort, and all Assets.  All persons having possession of property of the bankruptcy estate or Assets, including banks, accountants and other professionals, managers, agents and employees, shall immediately upon the Confirmation Date turn over all such property to the Plan Administrator and his agents, employees and professionals, in usable form, with instructions or access codes, as may be helpful.  Employment of all employees, agents and professionals of the Debtor shall terminate and executory employment contracts with them shall be deemed rejected immediately upon the Confirmation Date subject, however, to: (1) the obligations of all of Debtor's employees and professionals to cooperate with the Plan Administrator to effectuate a smooth transition and (2) the Plan Administrator and the previously employed employee, agent or professional having the option, but not the obligation, of reaching agreement for continued employment of such previously employed employee, agent or professional by the Plan Administrator.

Agreements between Debtor and VPHM are rejected on the Confirmation Date, subject to the obligation of all VPHM professionals, agents and employees to cooperate in a smooth transition with the Plan Administrator and subject to the option, but not the obligation, of the Plan Administrator and VPHM's employees, agents or professionals to reach agreement on continued employment.

The Plan Administrator shall honor all reservations and hospitality commitments of the Resort made in the ordinary course of business.

The Plan Administrator shall undertake and continue the sale of the Resort and the sale of all Assets, including all unsold fractional interests, separately or in bulk, consistent with this Plan.

2.   Post Effective Date Operations and Management

From and after the Effective Date, the Debtor shall be renamed VPD, LLC and will continue to exist for the purpose of implementing this Plan, fulfilling its duties and obligations and exercising its rights and powers under this Plan and conducting any activity consistent with

Error! Unknown document property name.
Error! Unknown document property name.

this Plan and Bankruptcy Court orders entered in this Case and shall do so without further action, consent or approval of its board of directors, officers, managers, or Membership Interest holders. VPD, LLC shall conduct any post-closing matters attendant to the Resort Sale, in accordance with applicable law, Bankruptcy Court orders and the provisions of this Plan. Except as otherwise provided in this Plan or the Confirmation Order, from and after the Effective Date, VPD, LLC may be operated without any limitation or restriction by, and without any requirement to comply with, the Bankruptcy Code, Bankruptcy Rules or Guidelines of the Office of the United States Trustee.

VPD, LLC shall, consistent with the interests of Creditors and the exercise of reasonable business judgment: (i) undertake those transactions that are necessary, advantageous or practicable to obtain the maximum value from the Assets; and (ii) endeavor in good faith and without undue delay to liquidate all of the Assets by collecting, realizing or prosecuting such Assets, including enforcement and prosecution of the Causes of Action. In addition, VPD, LLC may sell, lease, license, transfer, destroy, abandon or otherwise transfer or dispose of Assets other than the Resort (which shall be offered for sale pursuant to the procedures set forth elsewhere in this Plan) or Cash, in its discretion in the best interests of Creditors.

From and after the Effective Date, VPD, LLC shall be managed and governed by the Plan Administrator, who shall act as the agent and representative of VPD, LLC and shall be deemed its sole director, secretary and chief executive and financial officer to the extent required by applicable law or for purposes of executing agreements, instruments and other documents on behalf of VPD, LLC. The Plan Administrator shall, subject to the terms of this Plan, be empowered to effect all actions necessary to perform and enforce the duties, obligations and rights of VPD, LLC under this Plan, Bankruptcy Court orders and applicable law including: (a) conducting the Resort Sale in accordance with the terms of this Plan and the Bidding Procedures, (b) liquidating the Assets other than the Resort (including prosecuting the Causes of Action) for the benefit of Creditors, (c) reviewing, objecting to, negotiating, settling or otherwise compromising any Causes of Action, (d) executing agreements, instruments, and other documents, (e) resolving Disputed Claims and Disputed Interests, (f) making Distributions and paying expenses of administering the Plan, (g) employing and compensating professionals, (h) collecting receivables and other amounts due, (i) borrowing funds pursuant to Bankruptcy Code Section 364, (j) exercising the rights, power and authority of VPD, LLC under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, (k) furnishing such information regarding administration of the Plan as may be requested by parties-in-interest unless otherwise ordered by the Bankruptcy Court, (l) maintaining appropriate types and levels of insurance coverage, (m) exercising such other powers as may be vested in the Plan Administrator by this Plan or Bankruptcy Court order or as deemed by the Plan Administrator to be necessary and proper in its sole discretion to implement the provisions of this Plan, (n) winding up the affairs of VPD, LLC, (o) dissolving VPD, LLC pursuant to applicable non-bankruptcy law after its affairs have fully wound up pursuant to the provisions of this Plan, and (p) closing the Case. All actions taken by the Plan Administrator shall be deemed approved pursuant to the applicable general corporation law of the state in which VPD, LLC is formed without any requirement of

further action by its existing board of directors, officers, managers or holders of Membership Interests.

The Plan Administrator shall review Claims that are Disputed Claims as of the Confirmation Date and he shall exercise his best efforts to resolve, fairly and efficiently, by agreement with the Creditor holding the Claim, all Claims that have not been Allowed by the Confirmation Date, including but not limited to Mechanics Lien claims in the Arbitration. The Plan Administrator's agreement to a settlement with a Creditor shall be submitted to the Plan Administration Committee. The Plan Administration Committee's approval of a settlement shall be final and binding unless a member of the Plan Administration Committee seeks Bankruptcy Court review of that approval within twenty days of such approval.

The Plan Administrator shall File quarterly reports with the Bankruptcy Court and provide copies to the Plan Administration Committee, summarizing its progress administering the Assets and this Plan.

The Plan Administrator shall maintain a fiduciary bond in the amount of $50,000 until the Closing Date and thereafter in the amount of Available Funds and the Plan Administrator shall be reimbursed for the premium for such bond from Available Funds. On motion of a party in interest, the Plan Administrator may be terminated by the Bankruptcy Court for failing to maintain a fiduciary bond, willful misconduct or gross negligence.

3.    Cash

Immediately upon the occurrence of the Confirmation Date, all Cash under the control or possession of the Debtor shall be transferred to the Plan Administrator and deposited into the Distribution Accounts and the Plan Administrator's operating accounts, which shall be maintained at a bank or other financial institution determined in the Plan Administrator's discretion consistent with this Plan. The funds to effect the payments under this Plan will be generated from (i) Cash on hand in any deposit account of the Debtor, which shall be transferred to the Plan Administrator as provided herein, (ii) Proceeds of Pre-Confirmation Asset Unit Sales, (iii) Village Inn Parking Space Sales Proceeds; (iv) Resort Proceeds, (v) proceeds other than Proceeds of Pre-Confirmation Asset Unit Sales, Village Inn Parking Space Sales Proceeds, and Resort Sale Proceeds from the liquidation of Assets, including prosecution of any Causes of Action or other claims against third parties, and (vi) any other funds available to or received by the Plan Administrator or by VPD, LLC (all as described herein, the "Available Funds").

4.    Professional Fees Incurred After the Confirmation Date

The Plan Administrator shall be paid on an hourly basis at the rate of $275 per hour from the first proceeds from the operation or disposition of the Resort for services rendered leading up to and after the Confirmation Date, through the procedures set forth below. Compensation due the Plan Administrator shall include compensation for work done by the Plan Administrator before the Confirmation Date in connection with this case. The Plan Administrator shall also be reimbursed for reasonable out of pocket expenses. The Plan Administrator shall use such of its

22

employees as it deems necessary. The Plan Administrator shall also hire such professionals and consultants, including, without limitation, legal counsel, accountants, and hotel management, as it deems necessary on an hourly or other basis. The Plan Administrator may hire professionals employed by VPD prior to the Confirmation Date on such terms as may be agreed upon between the Plan Administrator and the previously employed professionals. The Plan Administrator shall pay salaried employees whom he hires as their salary comes due at the rate agreed to with them. Compensation of all others hired by the Plan Administrator shall be pursuant to the report process described below.

Each month the Plan Administrator shall deliver to the members of the Plan Administration Committee a report of hours expended and fees or salary paid by the Plan Administrator and all employees, professionals and consultants retained by it and their compensation. Any member of the Plan Administration Committee shall have twenty (20) days from the receipt of that report to serve a written objection to such fees with the Plan Administrator and shall serve a copy of any objection so served on the entity whose fees are the subject of objection. Compensation shall not be paid until the objection is resolved or, if compensation was paid before the objection was served, compensation shall be promptly disgorged unless the objection is resolved within twenty days of service of the objection. If the objection is not resolved within twenty days, either the objecting party or the Plan Administrator or the party seeking compensation may apply to the Bankruptcy Court for determination of what compensation, if any, is appropriate. The Plan Administrator shall submit to the Bankruptcy Court an application for approval of his fees when his services have been completed.

Shaw has advanced to the Plan Administrator a retainer in the amount of $10,000. Shaw shall be reimbursed for this retainer from the first proceeds available from the operation or disposition of the Resort.

5.    Limitation of Liability of the Plan Administrator and the Plan Administration Committee

No action or claim may be asserted against the Plan Administrator, the Plan Administration Committee, or any member of the Plan Administration Committee on any matter relating to or arising out of this Chapter 11 Case, the Resort Sale, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be administered or distributed under the Plan, in any court without first obtaining approval of the Bankruptcy Court, and, in such event, any such action must be prosecuted before the Bankruptcy Court, which shall retain jurisdiction to adjudicate any such actions. The Plan Administrator is acting solely as a fiduciary on behalf of the Debtor and/or VPD, LLC, as the case may be, as debtor-in-possession, in implementing this Plan, and the recovery of any claim asserted against the Plan Administrator shall be limited to the Assets that he is administering. Neither the Plan Administrator, nor any of its employees, shall have any personal liability for serving in the fiduciary capacity of Plan Administrator, except for willful misconduct or gross negligence. The bankruptcy estate, and the proceeds from disposition of the bankruptcy estate, shall be made and held available to indemnify and hold harmless the Plan Administrator, the Plan Committee, and

23

the members of the Plan Committee, from any claims or loss arising from their service in connection with this Plan.

6.     <u>Plan Administration Committee</u>

On or as soon as practical after the Confirmation Date, a ~~three~~<u>five</u> (3<u>5</u>) member Plan Administration Committee shall be appointed, which shall consist of one representative appointed by Shaw, one representative appointed by the Class <del>5</del><u>6</u> General Unsecured Creditors and<u>, one representative appointed by</u> the Fractional Interest Owners (Class 6<u>7</u>), ~~and~~ one member appointed by a majority in number of the Mechanic's Lien Claimants not including Shaw <u>and a representative appointed by Capmark Bank</u>.  After the Effective Date, the Plan Administrator shall serve at the direction of the Plan Administration Committee, *provided, however,* the Plan Administration Committee may not direct the Plan Administrator or the members of the Plan Administration Committee to act inconsistently with their duties under the Plan.  The Plan Administration Committee may terminate the Plan Administrator at any time in accordance with the provisions of this Plan.  Decisions of the Plan Administration Committee shall be made by majority vote.  Meetings and votes may be held by telephone. The Plan Administration Committee may enact bylaws and shall choose a chair as soon as practical after the Confirmation Date.  Upon the resignation or unavailability of a Plan Administration Committee member, the constituency for that member (*e.g.*, Shaw, the Mechanic's Lien Claimants not including Shaw, and the Class <del>5</del><u>6</u> General Unsecured Creditors and the Class 6<u>7</u> Fractional Interest Owners) shall select the successor to that member.  <u>When Shaw or Capmark Bank have been paid in full, their position on the Committee shall terminate</u>.

7.     <u>Payment of United States Trustee Fees and Compliance with Reporting Requirement</u>.

The Plan Administrator will pay quarterly fees due the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) in full on the Effective Date of the Plan, and shall remit quarterly fees due the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) as they may come due until the Chapter 11 case is dismissed, converted, or closed.  The Plan Administrator will comply with applicable reporting requirements to the United States Trustee.

C.     *Rights and Powers of the Plan Administrator*

From and after the Confirmation Date, the Plan Administrator shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, the right to (1) operate the Resort; (2) effect all actions and execute all agreements, instruments and other documents necessary to operation of the Resort and/or implementation of the Plan; (3) liquidate any Assets, including, without limitation, the Resort; (4) prosecute, settle, abandon or compromise any Causes of Action; (5) borrow funds; (6) make Distributions contemplated hereby, (7) establish and administer any necessary reserves for Disputed Claims that may be required; (8) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner

24

approved by the Bankruptcy Court such claims and objections; and (9) employ and compensate professionals and other agents, subject to approval by the Bankruptcy Court as provided in the Plan.

D.     *Directors/Officers/Equity/Assets of the Debtor on the Confirmation Date*

On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtor shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause. No persons who have served as officers or directors of the Debtor or its affiliates, or who have been members of the Debtor or its affiliates, at any time before the Confirmation Date, shall be hired by the Plan Administrator without the express authorization of the Plan Administration Committee.

E.     *Cancellation of Membership Interests*

On the Effective Date, all the Membership Interests in the Debtor (including all instruments evidencing such Membership Interests) shall be canceled and extinguished and shall be of no further force and effect, without any further action under any applicable agreement, law, regulation or rule, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged. The holders of or parties to any such cancelled Membership Interests will have no remaining rights against the Debtor or the Estate whether arising from or relating to such interests or the cancellation thereof.

F.     *Renaming of Vail Plaza Development, LLC*

As of the Effective Date, Vail Plaza Development, LLC shall be renamed VPD, LLC.

G.     *Exclusivity Period*

Subject to further order of the Bankruptcy Court, Shaw shall, pursuant to section 1127 of the Bankruptcy Code, retain the exclusive right to amend the Plan.

H.     *Establishment of the Administrative Bar Date*

1.     Except as otherwise provided in Article IV.H.3 of the Plan, on or before the Administrative Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of Administrative Claim (a) by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Clerk of the Bankruptcy Court at 721 19th Street, Denver, Colorado 80202-2508 or (ii) by using the Bankruptcy Court's CM/ECF electronic filing system.

2.     The request for payment of an Administrative Claim will be timely filed only if it is *actually received* by the Bankruptcy Court on or before the Administrative Bar Date.

Error! Unknown document property name.
Error! Unknown document property name.

3.    Notwithstanding anything in Article IV.H.1 of the Plan, the Debtor's professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.

I.    *Term of Injunctions or Stays*

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

## ARTICLE V.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Initial Distribution Date*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Plan Administrator shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

B.    *Distribution in Order of Priority*

No distribution shall be made to a junior class until senior classes have received payment in full, or a Disputed Reserve has been established sufficient to provide for payment in full.

C.    *Disputed Reserves*

1.    Establishment of Disputed Reserve

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Plan Administrator shall establish a separate Disputed Reserve for Disputed Claims, which Disputed Reserve shall be administered by the Plan Administrator. The Plan Administrator shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VI.B hereof) with respect to each Disputed Claim.

2.    Maintenance of Disputed Reserves

To the extent that the property placed in a Disputed Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The Plan Administrator shall hold property in the Disputed Reserves in trust for the benefit of the holders of Claims ultimately determined to be Allowed. The Disputed Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of the

26

Disputed Reserve, all Cash (including any Cash Investment Yield) or other property held in that Disputed Reserve shall revest in and become the property of VPD, LLC. All funds or other property that vest or revest in VPD, LLC pursuant to this paragraph shall be (a) used to pay the fees and expenses of the Plan Administrator as and to the extent set forth herein, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

D.    *Quarterly Distributions*

Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Plan Administrator in the Disputed Reserve pursuant to Article V.B and Distributed in accordance with this Plan on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with this Article V.D.

E.    *Record Date for Distributions*

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Plan Administrator shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that are known to the Plan Administrator as of the Record Date.

F.    *Delivery of Distributions*

1.    General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Plan Administrator at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Debtor has been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Plan Administrator may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Plan Administrator deems appropriate, but no Distribution to any holder shall be made unless and until the Plan Administrator has determined the then-current address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be

27

returned to, and held in trust by, the Plan Administrator until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth below in Article V.E.3.  The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

      2.      <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions (other than the final Distribution Date) would be $50 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Plan Administrator no later than twenty (20) days after the Effective Date.

      3.      <u>Unclaimed Property</u>

Except with respect to property not Distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Plan Administrator, and the Claims with respect to which those Distributions are made shall be automatically canceled.  After the expiration of that one-year period, the claim of any Entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any holder of an Allowed Claim.  All funds or other property that vests or revests in VPD, LLC pursuant to this Article shall be (a) used to pay the fees and expenses of the Plan Administrator as and to the extent set forth herein, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

G.      *Surrender of Canceled Instruments and Securities*

      1.      <u>Generally</u>

Except as set forth in Article V.G hereof, as a condition precedent to receiving any Distribution hereunder on account of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to Article IV.E hereof, the holder of such Claim shall tender such instrument, security or other documentation evidencing such Claim to the Plan Administrator.  Any Distributions pursuant to the Plan on account of any Claim evidenced by such instruments, securities or other documentation shall, pending such surrender, will be treated as an undeliverable Distribution in accordance with Article V.E hereof.

      2.      <u>Failure to Surrender Canceled Instruments</u>

If any holder of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to Article IV.E hereof, fails to surrender such instrument, security or other documentation or comply with the provisions of Article V.F.1 hereof within one

28

Error! Unknown document property name.
Error! Unknown document property name.

year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such holder shall be forever barred from asserting such Claim against the Estate. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in Article V.E.3 hereof.

H.   *Lost, Stolen, Mutilated or Destroyed Instrument or Security*

Any holder of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to Article IV.E hereof that has been lost, stolen, mutilated or destroyed, shall, in lieu of surrendering such instrument, security or documentation deliver to the Plan Administrator (i) an affidavit of loss reasonably satisfactory to the Plan Administrator setting forth the unavailability of such instrument, security, or other documentation and (ii) such additional security or indemnity as may reasonably be requested by the Plan Administrator to hold the Plan Administrator harmless from any damages, liabilities, or costs incurred in treating such Entity as a holder of an Allowed Claim. Upon compliance with this Article V.G by a holder of an Allowed Claim evidenced by such instrument, security or other documentation, such holder shall, for all purposes under the Plan, be deemed to have surrendered such instrument, security or other documentation.

I.   *Manner of Cash Payments Under the Plan*

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

J.   *Time Bar to Cash Payments by Check*

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Article V.I. shall be made directly to the Plan Administrator by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of VPD, LLC as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Article V.E.3.

K.   *Limitations on Funding of Disputed Reserves*

Except as expressly set forth in the Plan, the Plan Administrator shall not have any duty to fund the Disputed Reserve.

Error! Unknown document property name.
Error! Unknown document property name.

L.    *Compliance with Tax Requirements*

In connection with making Distributions under this Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Plan Administrator to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.E.1.

M.    *No Payments of Fractional Dollars*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

N.    *Interest on Claims*

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim except as provided in the Plan. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

O.    *No Distribution in Excess of Allowed Amount of Claim*

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

## ARTICLE VI.
## DISPUTED CLAIMS

A.    *No Distribution Pending Allowance*

Notwithstanding any other provision of the Plan, the Plan Administrator shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

B.    *Resolution of Disputed Claims*

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, after the Confirmation Date, the Plan Administrator shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to set (with appropriate notice) the Claim Objection Bar Date and to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims, except that the Arbitration  shall continue as necessary and shall be the means of resolving disputes subject to the Arbitration; provided, however, the Plan Administrator may, as part of its duties, attempt to negotiate agreements to resolve disputed claims that are the subject of the Arbitration.  Final Arbitration Decisions shall be final and binding on all parties in interest, including the Plan Administrator. The costs of pursuing the objections to Claims shall be borne by the Plan Administrator.

C.    *Disallowance of Claims*

Except as otherwise agreed, any and all proofs of Claim Filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Rejection of Executory Contracts and Unexpired Leases*

The Plan Administrator shall have until ten days following the Closing Date to file a motion to assume or reject executory contracts and unexpired leases.  Any executory contract or unexpired lease not affirmatively assumed or rejected (other than any asset purchase agreement pursuant to which the Resort Sale shall be consummated) shall be deemed automatically rejected as of the Effective Date and none of the Debtor, VPD, LLC, the Plan Administrator, Shaw, or the Estate shall have any further liability thereunder except for Allowed Claims resulting from such rejection.

31

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be Filed with the Bankruptcy Court and served on Shaw and the Plan Administrator no later than thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Estate, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX.D. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan, except for any claim that may arise from the rejection of the management contract among the Debtor and Vail Plaza Management, Inc., or any other contract or agreement among the Debtor and any Insider, which shall be treated as a Subordinated Claim subject to the provisions of Article III of the Plan.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.    *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.    The Confirmation Order has become a Final Order.

2.    The Confirmation Order shall be in full force and effect.

3.    The Closing Date of the Resort Sale shall have occurred.

4.    Notwithstanding the foregoing, Shaw reserves, in its sole discretion, the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Error! Unknown document property name.
Error! Unknown document property name.

## ARTICLE IX.
## RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.    *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Membership Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Membership Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Membership Interests.  The Arbitration shall, however, be the sole method of determination of matters within the scope of the Arbitration, subject, however, to settlements of those matters that may be worked out by the Plan Administrator in agreements as set forth in Article IV B ~~2.~~2, and subject to the sale of claims against Shaw as provided in the Asset Purchase Agreement.

B.    *Exculpation*

Neither Shaw, nor the Plan Administrator, nor the Plan Committee, nor any member of the Plan Committee, nor any of their respective officers, directors, shareholders, employees, agents, members, professionals or counsel shall have or incur any liability to any holder of a Claim or Membership Interest, to the Debtor, nor to any other party in interest, or to the Plan Administrator, or any of their respective agents, advisors, or attorneys, for any act or omission in connection with, or arising out of this Chapter 11 Case, the Resort Sale, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be administered or distributed under the Plan, except for willful misconduct or gross negligence.

C.    *Preservation of Rights of Action*

1.    <u>Vesting of Causes of Action</u>

(a)    Except as otherwise provided in the Plan ~~or,~~ the Confirmation Order, or the Asset Purchase Agreement, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest upon the Effective Date in VPD, LLC.  <u>Any and all counterclaims asserted by Debtor against Shaw in the Arbitration pending before William Knapp relating to the Hotel, including but not limited to any claims the Debtor has or may have against Shaw or others relating to defective or deficient work on the Hotel, shall be sold pursuant to the Asset Purchase Agreement and shall not be available to Debtor or to the Plan Administrator or to VPD LLC, either as affirmative sources of recovery, setoffs, defenses, or otherwise and shall not be considered in the Arbitration.</u>

(b)    Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Plan Administrator shall have the exclusive right to institute,

33

Error! Unknown document property name.
Error! Unknown document property name.

prosecute, abandon, settle or compromise any Causes of Action <u>(with the exception of Causes of Action relating to or arising out of counterclaims asserted by Debtor against Shaw in the Arbitration pending before William Knapp relating to the Hotel, including but not limited to any claims the Debtor has or may have against Shaw or others relating to defective or deficient work on the Hotel, and also not including any and all claims that Debtor has or may have against Zehren & Associates, Inc., including but not limited to claims for design errors or omissions relating to the Hotel, all of which shall be sold pursuant to the Asset Purchase Agreement and not considered in the Arbitration)</u>, in accordance with the terms of the Plan and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, subject, however, to any determinations that may have become final in the Arbitration. The Plan Administrator shall succeed to VPD's position in the Arbitration on the Confirmation Date. The Plan Administrator shall be bound by the Arbitrator's rulings, both before and after the Confirmation Date. The Plan Administrator may settle part or all of the Mechanic's Lien Claims with the agreement of the Mechanic's Lien Claimants.

(c)     Causes of Action and any recoveries therefrom shall remain the sole property of VPD, LLC (for the sole benefit of the holders of Claims to be distributed in accordance with the terms of this Plan), and holders of Claims shall have no right to any such recovery outside of the terms of this Plan.

2.     <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

(a)     Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised ~~or~~, settled in the Plan or any Final Order (including the Confirmation Order) <u>or sold pursuant to the Asset Purchase Agreement</u>, such Cause of Action is expressly reserved for later adjudication by the Plan Administrator (including, without limitation, Causes of Action not specifically identified or described in the ~~Plan Supplement~~<u>Disclosure Statement</u> or elsewhere) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order) <u>or sold pursuant to the Asset Purchase Agreement</u>. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

(b)     Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money

34

or property of the Debtor, or who has transacted business with the Debtor, should assume that any such obligation, transfer, or transaction may be reviewed by the Plan Administrator subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of Claim against the Debtor in the Chapter 11 Case; (ii) an objection to any such Entity's proof of Claim has been Filed; (iii) any such Entity's Claim was included in the Schedules; (iv) an objection to any such Entity's scheduled Claim has been Filed; or (v) any such Entity's scheduled Claim has been identified as disputed, contingent or unliquidated.  The Claims allowance process, the Arbitration, and any settlements that are worked out with the Plan Administrtor~~Administrator~~ shall be the sole, exclusive, and conclusive means of allowance and adjudication of any and all claims by or against creditors~~, including Shaw and the Mechanic's Lien Claimants,~~ in connection with the Debtor or the bankruptcy estate, or the construction of the Resort, ~~including but not limited~~except that claims relating to warranty or alleged construction defect claims, or counterclaims shall be sold pursuant to the Asset Purchase Agreement.  Claims not adjudicated through the Claims allowance process, including the Arbitration, and not sold, shall be released and forever barred.

D.    *Release and Injunction*

1.    From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor and its successors and assigns and its Estate, assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

2.    Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor or its successors and assigns and its Estate, assets and properties, any other Claims or Membership Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

3.    The rights afforded in the Plan and the treatment of all Claims and Membership Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Membership Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or its successors and assigns or any of its assets or properties.  On the Effective Date, all such Claims against, and Membership Interests in, the Debtor shall be satisfied and released in full.

4.    Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Membership Interest satisfied and released hereby, from:

(a)    commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, its successors and assigns and its Estate, assets and properties;

(b)    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, its successors and assigns and its Estate, assets and properties;

(c)    creating, perfecting or enforcing any encumbrance of any kind against the Debtor or its Estate, assets and properties;

(d)    asserting any right of setoff or subrogation of any kind against any obligation due from the Debtor or against the Debtor, its Estate, assets and properties except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim; or

(e)    commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Membership Interest or Cause of Action satisfied and released hereunder.

E.    *Releases of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estate shall be fully released and shall attach and shall attach to the Resort Sale Proceeds and the Proceeds of Pre-Confirmation Unit Sales, and Proceeds of Pre-Confirmation Parking Space Sale in the order or priority, to the extent, in the amount, and with the validity as they attached to the Assets.

## ARTICLE X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, the Plan, and the Plan Administrator as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Membership Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Membership Interests;

Error! Unknown document property name.
Error! Unknown document property name.

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date as provided in this Plan;

3.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.C adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

4.      ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date, *provided, however,* that the Plan Administrator shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX.A and Article IX.B;

10.      enforce the Injunction set forth in Article IX.D;

11.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and/or the decree contemplated in Federal Rule of Bankruptcy Procedure 3022 concluding the Chapter 11 Case.

**ARTICLE XI.**
**MISCELLANEOUS PROVISIONS**

A.     *Final Fee Applications*

The deadline for submission by Professionals of applications for Bankruptcy Court approval of Accrued Professional Compensation shall be forty-five (45) days after the Effective Date.

B.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code shall continue to be paid pursuant to the provisions of such section.

C.     *Modification of Plan*

Subject to the limitations contained in the Plan:  (1) Shaw reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, Shaw or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

D.     *Revocation of Plan*

Shaw reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If Shaw revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Membership Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of Shaw or any other Entity; or (c) constitute an admission of any sort by Shaw or any other Entity.

38

E.      *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

F.      *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Colorado, without giving effect to the principles of conflict of laws thereof.

G.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Shaw or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) Shaw with respect to the Debtor or the holders of Claims or Membership Interests or other parties-in-interest; (2) the Debtor with respect to the holders of Claims or Membership Interests or other parties-in-interest; or (3) any holder of a Claim or other party-in-interest prior to the Effective Date.

H.      *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto (including, without limitation, the Resort Sale) shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

I.      *Section 1125(e) Good Faith Compliance*

Shaw and its Representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

J.      *Further Assurances*

The Debtor, Plan Administrator, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any

Error! Unknown document property name.
Error! Unknown document property name.

agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

K.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to Shaw or the Plan Administrator shall be sent by first class U.S. mail, postage prepaid as follows:

To Shaw:

Sherman & Howard LLC
Attorneys and Counselors at Law
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone: 303-297-2900
Facsimile: 303-298-0940
Attn.: Mark L. Fulford, Esq.
Michael J. Cook, Esq.
John W. Mill, Esq.

To the Plan Administrator:

William Sullivan
P.O. Box 8070
Jackson, Wyoming 83002

Federal Express Address:
185 South Swan Road
Jackson, Wyoming 83001

Telephone: (307) 733-7364

L.    *Filing of Additional Documents*

On or before the Effective Date, Shaw may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

M.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e) and 7062.

Dated: ~~September 16,~~November 20, 2009

40

SHAW CONSTRUCTION, LLC

_____

By: Clark Atkinson
Its:  Executive Vice President

41

Error! Unknown document property name.
Error! Unknown document property name.

~~Schedule 1~~Exhibit A:  Asset Purchase Agreement

## Exhibit B: Bidding Procedures

## Exhibit B

## Bidding Procedures

**Bidding Procedures**

1.    Set forth below are procedures (the *"Bidding Procedures"*) to be used for the sale of the Resort.  The sale will be subject to competitive bidding as set forth herein.

**Assets to be Sold**

2.    The Resort will be offered for sale to one or more bidders.

3.    Shaw reserves the right to offer the Resort for sale in any manner whatsoever as it may determine will result in the highest or otherwise best price for the Resort.  The Estate retains all rights to the Resort or any portion thereof that is not subject to a bid accepted by the Estate.

4.    The Resort and the Assets may be sold in bulk, or in separate parcels or lots.  The unsold club estate or fractional interests may be sold individually, as a group or groups of all or some of the club estates or fractional interests, or as a part of the sale of the Resort.  The penthouse may be sold separately, or as part of the sale of the Resort.

5.    The accounts receivable and cash may be included in the sale, or may be excluded.  Causes of Action will not be sold, unless specifically identified.

6.    The Proceeds of Pre-Confirmation Asset Unit Sales and  the Village Inn Parking Space Sales Proceeds, and any other funds that may be held in escrow pursuant to Bankruptcy Court Order, will not be sold, but rather will be administered pursuant to the terms of this Plan.

**Indications of Interest**

7.    The Plan Administrator or the Broker shall send a form of confidentiality agreement (the *"Confidentiality Agreement"*) to any person indicating an interest in participating in the Auction of the Resort and requesting information about the Resort who has not previously signed such a confidentiality agreement.

**Selection of Qualified Bidders**

8.    Each potential purchaser shall complete and execute the Confidentiality Agreement and provide Shaw and the Plan Administrator no later than three (3) business days prior to the Auction with (i) evidence (in the form of cash on hand, an unconditional commitment letter, an irrevocable letter of credit or like evidence) of its financial ability to purchase the Resort and (ii) such other information as Shaw and the Plan Administrator reasonably requests to demonstrate the potential purchaser's ability to purchase the Resort and timely

consummate its bid (all of the foregoing, collectively, an "*Adequate Assurance Package*"). No later than two (2) business days before the Auction, Shaw will identify those potential purchasers who have delivered an Adequate Assurance Package satisfactory to Shaw ("*Qualified Bidders*"), and who may continue with the bidding process (the "*Bidding Process*"). Any person who wishes to participate in the Bidding Process with respect to the Resort must be a Qualified Bidder with respect to the Resort. Neither Shaw nor the Plan Administrator shall be obligated to furnish any information of any kind whatsoever relating to the Resort to any person who Shaw does not believe is capable of becoming a Qualified Bidder. Shaw, in its sole discretion, may amend the rules set forth herein for the Bidding Process or adopt such other rules for the Bidding Process that will better promote the goals of the Bidding Process.

## Form of Asset Purchase Agreement and Due Diligence

9.  Shaw, the Plan Administrator, or the Broker shall send to each prospective bidder a copy of a Proposed Asset Purchase Agreement. Each Qualified Bidder submitting a bid shall produce a markup of the Proposed Asset Purchase Agreement (each, an "*APA Markup*") containing the terms of its bid, including the amount and any other terms of consideration offered for the Resort to be purchased. Shaw, the Broker, and the Plan Administrator will provide Qualified Bidders with reasonable access to the books, records, and executives of the Resort for the purpose of conducting due diligence. Any interested bidder should contact _____, Attention: _____, _____, Denver, Colorado _____, Telephone: (303) _____, Facsimile: (303) _____, to seek to become a Qualified Bidder and, thereafter, to request information in connection with due diligence.

## Submission of Bids/Deposit

10. All bids must be in writing and accompanied by an executed APA Markup. Each Qualified Bidder must submit a "clean", executed version of the APA Markup together with a blackline, which reflects the proposed changes to the terms and conditions of the Proposed Asset Purchase Agreement. IF ANY BID IS CONDITIONED ON THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, THEN SUCH BIDDER SHALL PROVIDE A LIST OF THOSE EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND SHALL BE REQUIRED TO PROVIDE EVIDENCE OF ITS ABILITY TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF SUCH CONTRACTS OR LEASES ALONG WITH THE BID (the bid along with the information required in this paragraph 7, an "ADEQUATE ASSURANCE PACKAGE"). Each APA Markup shall propose value in an amount at least equal to the sum of $_____ and be accompanied by a good faith cash deposit (the "*Good Faith Deposit*") equal to Three Million Dollars ($3,000,000.00) payable to the Debtor at an account designated by the Plan Administrator. All APA Markups and

Error! Unknown document property name.

Adequate Assurance Packages must be submitted in writing so that they are actually received no later _____, 2009 at 4:00 p.m. (prevailing Mountain Time) (the "*Bid Deadline*") **(which will be three weeks before the auction)** by the Plan Administrator, _____, Denver, Colorado _____, Attention: _____, with copies to the following parties: (i) counsel for Shaw, Sherman & Howard LLC, 633 Seventeenth Street, Denver, Colorado 80202, Telephone: 303-299-2900, Facsimile: (303) 298-0940, Attention: Mark L. Fulford, Esq.; and John Mill, Esq. (ii) counsel to Capmark Bank, Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, Illinois 60603, Attention: John Robert Weiss, Esq.

11.     By submitting a signed APA Markup with a Good Faith Deposit, a Qualified Bidder irrevocably offers for a period of 60 days after the Auction to purchase the Resort pursuant to the terms of the Qualified Bidder's APA Markup, if such agreement is accepted by Shaw.

12.     Bids must: (i) provide for a purchase price which is at least as much as $_____ and specify the portion of consideration to be paid in cash and the portion to be paid in any other form of value; (ii) if any consideration is to be provided in a form other than Cash, provide information concerning such consideration to permit Shaw to assess accurately the value of such consideration; (iii) provide sufficient indicia that such Qualified Bidder or representative is legally empowered, by power of attorney or otherwise, and financially capable to (A) bid on behalf of the prospective bidder, and (B) complete and sign, on behalf of the bidder, a binding and enforceable asset purchase agreement; (iv) identify with particularity each and every executory contract or unexpired lease the assumption and assignment of which is a condition to closing; and (v) identify with particularity each and every other condition to closing. Bids cannot contain any financing contingencies.

13.     A bid that Shaw determines, in its sole discretion, meets all the foregoing requirements constitutes a "Qualified Bid." Shaw is permitted but not required to consider any bid or bidder that does not timely comply with all of the foregoing requirements. No later than two (2) business days before the Auction, Shaw shall inform each Qualified Bidder which bids have been designated as Qualified Bids.

14.     Except as set forth herein, all bids shall be kept confidential with access restricted to the Plan Administrator, Shaw, and other Qualified Bidders. Bids may, however, be revealed to any other party at the option of Shaw. Shaw may request additional information from a bidder to evaluate such bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith and such bidder shall be obligated to provide such information as a precondition to participating further in the Bidding Process and Auction.

**"As Is, Where Is"**

15.   The sale of the Resort shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, the Plan Administrator, the Estate, or Shaw, or any of their Representatives, except to the extent set forth in any agreement(s) with the Successful Bidder(s).   Except as otherwise provided in the Proposed Asset Purchase Agreement, all of the Debtor's right, title and interest in and to the Resort to be acquired shall be sold free and clear of all encumbrances (except assumed liabilities), as defined in the Proposed Asset Purchase Agreement or APA Markup, as applicable.   Cash and Causes of Action shall not be sold unless specifically identified.   The Plan Administrator may exclude other Assets from the Resort Sale.

16.   Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Resort to be acquired and to conduct any and all due diligence regarding the Resort prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Resort. or the completeness of any information provided in connection with the Bidding Process, in each case except as expressly stated in the APA Markup.

**Auction**

17.   If any Qualified Bid with respect to any of the Assets has been received from at least one Qualified Bidder, the Plan Administrator shall conduct the Auction with respect to the Resort.   The Auction shall take place on _____, 2009 at 9:30 a.m. (prevailing Mountain Time), at the offices of counsel for Shaw, Sherman & Howard L.L.C., 633 17th Street, Suite 3000, Denver, Colorado, or such other place and time as Shaw shall designate. Shaw, in its sole discretion, may adjourn the Auction to a different time and/or place, and the Plan Administrator shall notify all Qualified Bidders who have submitted Qualified Bids with respect to the Resort and expressed their intent to participate in the Auction of such adjournment.   All Qualified Bidders shall appear at the Auction in person, or through a duly authorized representative.   Only the previously determined Qualified Bidders shall be entitled to make further bids for the Resort at the Auction.   No later than two (2) business days prior to the Auction, Shaw shall provide copies of the Qualified Bid(s) it considers the highest or otherwise best Qualified Bid(s) to all Qualified Bidders who have submitted a bid on the Resort.   No later than one (1) business day prior to the Auction, each Qualified Bidder must inform Shaw whether it intends to participate in the Auction.

18.   If an Auction is conducted, all bids at the Auction shall be made with the opportunity for all Qualified Bidders to be present, consistent with the procedures authorized herein.

4

19.    At the start of the Auction, the Plan Administrator shall inform the Qualified Bidders participating in the Auction of the procedures governing the conduct of the Auction, which procedures shall be consistently and uniformly applied. Shaw shall have, in its sole and absolute discretion, the ability to set all Auction procedures. Each bid submitted after the opening Qualified Bid shall be in increments of not less than $50,000 (the "*Incremental Bid Amount*"). During the course of the Auction, the Plan Administrator shall inform each participant which Qualified Bid reflects the then highest or otherwise best offer, as determined by Shaw in its sole and absolute discretion.

20.    After the conclusion of the Auction or if Shaw determines not to hold an Auction, Shaw shall determine, in good faith, the highest or otherwise best offer for the Assets submitted by a Qualified Bidder (to the extent such bid(s) is acceptable, the "*Successful Bid*" and, the bidder making such bid, the "*Successful Bidder*"); *provided, however,* that Shaw may reject any and all bids. The Bankruptcy Court has set _____, 2009 at _____ a.m./p.m. for the Sale Hearing at which Shaw shall present the Successful Bid to the Bankruptcy Court for approval. Shaw reserves the right not to submit any bid to the Bankruptcy Court for approval which is not acceptable to it. Shaw may also designate one or more backup bidders whose bids may be accepted should the Successful Bidder fail to close. Nothing in these Bidding Procedures shall confer standing on any potential purchaser, including any Qualified Bidder, to seek relief from the Bankruptcy Court for any alleged failure by the Plan Administrator or Shaw to comply with the provisions of these Bidding Procedures, the Bidding Procedures Order, or any other order entered in connection with the Resort Sale.

## The Sale Hearing

21.    The Sale Hearing is presently scheduled to take place on _____, 2009 at _____ a.m./p.m. (prevailing Mountain Time) before the Honorable Howard R. Tallman, in Bankruptcy Courtroom B, located at U.S. Custom House, 721 19th Street, Denver, Colorado 80202. In the discretion of Shaw, the Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjournment at or before the Sale Hearing.

22.    Following Shaw approving the sale of the Resort to the Successful Bidder, if any such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid with respect to the Resort and the Plan Administrator shall be authorized, but not obligated, to effectuate such sale without further order of the Bankruptcy Court. If such failure to consummate the purchase is the result of a breach by the Successful Bidder, the Successful Bidder's Good Faith Deposit shall be forfeited to the Estate and the Estate specifically reserves the right to pursue any and all remedies against the breaching bidder.

Error! Unknown document property name.

## Closing

23.  The closing of the sale of the Resort (the "*Closing Date*") to the Successful Bidder(s) shall occur in accordance with the terms of the APA Markup (including any amendments or modifications).

## Reservation of Rights

24.  Shaw reserves the right, in its sole discretion and upon reasonable notice to Qualified Bidders (which may be in the form of a verbal or written announcement to Qualified Bidders), to (i) adjourn the deadlines set forth in the Bidding Procedures, including the Bid Deadline and Auction, and (ii) cancel the Auction altogether.

Error! Unknown document property name.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 08-26920 HRT |
| Vail Plaza Development, LLC | ) | (Chapter 11) |
| EIN : 75-1981329 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| Vail Plaza Mezzanine, LLC | ) | Case No. 08-26924 HRT |
| EIN: 75-1981329 | ) | (Chapter 11) |
| | ) | |
| Debtor. | ) | |
| | ) | Jointly Administered Under |
| | ) | Case No. 08-26920 HRT |
| | ) | |

## SHAW'S SUPPLEMENT TO DISCLOSURE STATEMENT IN CONNECTION WITH ITS FOURTH AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Secured and unsecured creditor Shaw Construction LLC ("Shaw") provides this Supplemental Disclosure in Connection with Shaw's filing its Fourth Amended Plan of Liquidation dated November 19, 2009 under Chapter 11 of the Bankruptcy Code ("Shaw's Fourth Amended Plan")

### EFFECTIVE $51 MILLION PURCHASE

Shaw has filed its Fourth Amended Plan to present a purchase of the Vail Plaza Hotel and Resort by a subsidiary of Apollo Real Estate Advisors. The purchase is for $46 million in new money, composed of $20 million in cash and $26 million in a 5-year note secured by the Hotel. Since the purchase does not include acquiring the escrows totaling nearly $5 million from sales of fractional interests and parking spaces during the bankruptcy, the effective purchase price is $51 million.

Ferruco Vail Ventures LLC ("Ferruco"), the purchaser presented in the Joint Plan of 176 Club Estate Owners and Capmark Bank, has continued to insist that the Bankruptcy Court approve its sale by December 4, 2009. Since the Bankruptcy Court has set a hearing on the Joint Plan proposing that sale for December 14, that approval seems unlikely, and Shaw believes that Ferruco intends to invoke that provision to withdraw or to diminish its offer. Shaw has,

EXHIBIT C

Ferruco intends to invoke that provision to withdraw or to diminish its offer. Shaw has, therefore, vigorously pursued other possible purchasers for the Hotel, and has worked out the Asset Purchase Agreement with the Apollo affiliate.

In brief summary, this purchase provides for the following:

- $20 million in cash on closing;

- a $26 million note for 5 years secured by the Hotel;

- the $5 million escrows for Fractional Interest Units and parking spaces sold during the bankruptcy remains available for creditors, which, in comparison to the Ferruco purchase proposed in the Club Estate Owners'/Bank Joint Plan, effectively adds $5 million to the transaction, making this the equivalent of a $51 million purchase, compared with Ferruco's proposed $52 million purchase, which did include buying the escrows;

- This is a "stalking horse" proposal and the Court can still accept a higher and better offer for the Hotel;

- the new proposed Purchaser has retained Hyatt Hotels to manage the Hotel. Hyatt has exceptional market recognition, quality management and Vail area experience with the Beaver Creek Hyatt;

- the new proposed Purchaser has completed their due diligence and is familiar with the property;

- Time to sell the Hotel is of the essence. The high ski season is the largest cash flow period for the Hotel. This new prospective Purchaser, and the Ferruco purchaser, have indicated that the value of the Hotel will drop significantly if the sale cannot be consummated in December, enabling new management to prepare for operations during the 2010 ski season. We believe that any potential prospective purchaser will value the Hotel the same way and that if the asset is not sold in December, the value will drop significantly;

- In order to achieve the highest and best price for the Hotel as promptly as possible, Shaw thinks it is important to bring this other purchaser forward.

The purchaser is related to the purchaser that had been working with the Debtor, Vail Plaza Development, LLC. That purchaser had offered $45 million in August, but that price had dropped to $37.5 million in the Debtor's October 22, 2009 Third Amended Plan of Reorganization. The offer Shaw presents in this Fourth Amended Plan, bringing $46 million in new money to the transaction, does not include any payment to VPD's insiders; the earlier proposals that this purchaser had negotiated with the Debtor had included up to $7 million in profits participation, plus 2-year employment contracts for Waldir Prado and his daughter valued

2

at a total of about $395,000. That is not in this proposal that Shaw is presenting; effectively, the profits participation is going to the creditors, in this proposed sale.

The Purchaser will acquire any claims against Shaw and the architect of the Hotel, Zehren & Associates, Inc.

We believe this purchase price is sufficient to provide significant payment to unsecured creditors, although that depends on factors that are hard to predict such as the amount of priority claims and how much of the Club Estate Owners' claims are allowed. We believe this purchase is the most likely to provide a payoff to unsecured creditors.

Shaw's Fourth Amended Plan is attached with the Asset Purchase Agreement for the Apollo affiliates purchase attached to that Plan as Exhibit A. Also attached to this Supplemental Disclosure Statement is a "black line" comparing Shaw's Fourth Amended Plan with its predecessor.

## COMMITTEE STRUCTURE AND JUNIOR MECHANICS LIENS

To provide additional opportunities for representation, Shaw has revised the structure of the Plan Committee under its Plan to provide that the Plan Committee will be composed of Shaw, a Shaw subcontractor, a representative of Capmark Bank, a representative of the general unsecured creditors (excluding the Club Estate Owners) and a representative of the Club Estate Owners. As creditor groups are paid off, they will drop off of the Plan Committee.

Shaw's Plan has also been revised to provide for the possibility that there are some mechanic's lien claimants whose lien is junior to Capmark Bank's lien, such as claimants who might have done renovation work after the Hotel was completed. To provide for that possibility, Shaw has created a new class of junior mechanics lien claimants. Shaw does not know whether any creditor fits into that class. Shaw and its subcontractors are senior to the Bank. But now that possibility is covered.

## MINIMUM PURCHASE PRICE

Shaw has included a provision on its Plan establishing a minimum effective purchase price of $51 million.

## CONTACT INFORMATION

There may be further developments in this case that you may find useful to be told about. Email messages would be the most prompt way, and facsimile would also work. If you wish to receive future updates, please provide your email or facsimile information to Clark Atkinson at Shaw (ClarkA@ShawConstruction.net, facsimile 970-241-5618) or to Mark Fulford, whose contact information is shown below.

3

Date: November 20, 2009

Respectfully submitted,

SHERMAN & HOWARD L.L.C.

By:/s/ Mark L. Fulford
Mark L. Fulford
Michael J. Cook
633 17th Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 297-2900

Attorneys for Shaw Construction LLC

4